# EXHIBIT A



## CONSULTING AGREEMENT

Consulting Agreement (this "Agreement") dated as of April 28, 2014, by and between 45 Park Place Partners, LLC, having an office c/o Soho Properties, Inc., 31 West 27th Street, New York, New York 10001 ("Owner") and S.A.S.U Ateliers Jean Nouvel, having an office 10, Cite d'Angouleme, 75011 Paris France ("Consultant").

### Recitals

WHEREAS, Consultant is an architectural firm experienced in the design of residential and public facilities;

WHEREAS, Owner wishes to engage Consultant on a non-exclusive basis to provide the architectural services described in Exhibit A (the "Services") and Consultant wishes to provide the Services to Owner, and the parties hereto agree as follows:

1. The Services.

   (a) Consultant shall provide the Services described in Exhibit A.

   (b) All plans, drawings, specifications, models and other material prepared or furnished pursuant to this Agreement and all rights therein ("Design Documents) shall be the property of Architect but shall not be used by Owner or Architect for any other project. Fully coordinated and reproducible copies in both unlocked electronic and hard-drawn format of all plans, drawings and specifications and all other such materials shall, to the extent not previously delivered, be promptly delivered to Owner upon demand. Architect grants Owner, its successors, assigns and sub-licensees, an exclusive, royalty-free, irrevocable, transferable license of the Design Documents to use, reproduce, distribute and publicly display same in connection with the construction, maintenance, alteration or marketing of the Project, and the creation, promotion, distribution and sale of any commercial products depicting the designs contained in the Design Documents provided that Owner substantially performs its obligations, including prompt payment of all sums when due, under this Agreement. If Owner modifies the Design Documents without Architect's consent, Owner shall, to the fullest extent permitted by law, defend and hold harmless Architect against liability for claims arising out of such modification.

   (c) Upon the termination of this Agreement by Owner, Architect may, and at Owner's request shall, remove its name from any documents thereafter submitted to Owner.

2. Compensation for Consultant's Services. Consultant shall be compensated for the Services in accordance with Exhibit A.

3. Independent Contractor; Status




PT

(a) Consultant agrees and acknowledges that in performing the Services pursuant to this Agreement, Consultant shall be acting as an independent contractor with respect to Owner, and not as an employee, agent, partner or joint venturer of Owner. Consultant, in its capacity as such, shall be free to accept other assignments and undertake other activities on his own account or for the accounts of third parties. Consultant agrees and understands that it shall not be authorized to, nor shall it, enter into any commitments, agreements or undertakings or assume any responsibilities in the name or on behalf of Owner.

(b) Consultant will bear sole responsibility for payment on its own behalf of any unemployment insurance, workers' compensation insurance, liability insurance, health insurance, retirement or other welfare or pension benefits, and/or other payments and expenses, other than for out-of-town travel which shall be reimbursed by Owner. Consultant agrees to indemnify and hold Owner harmless in respect of all such payments claimed or assessed by any taxing authority, including reasonable attorneys' fees. Consultant understands and agrees that neither Consultant nor any of its staff or affiliates is eligible for, and it and they hereby waive any claim to, wages, compensation incentives, profit-sharing participation, health coverage or any other benefits provided to employees of Owner. Consultant and Owner hereby acknowledge and agree that the Agreement does not constitute a hiring or employment agreement by either party. Neither Consultant nor any of its staff or affiliates will be eligible to participate in any employee benefit plans or programs of Owner.

(c) Owner will not control and will have no right to control the manner, means or method by which Consultant performs the Services. However, Owner will have the right to exercise general supervision over the results to be derived from the Services.

(d) If at any time Consultant's status as an independent contractor is challenged, Consultant agrees to give Owner immediate notice thereof and to cooperate fully with Owner in defending such challenge if so requested.

4. Confidential Matters.

(a) During the course of the Services, Owner acknowledges and agrees that it may disclose to Consultant, or Consultant will learn or develop, trade secrets and proprietary and confidential business information of and for Owner, and its affiliates, including but not limited to their methodologies, business methods, processes, budgets and financial information (all of which are collectively referred to herein as the "Confidential Matters"). Consultant acknowledges and agrees that the Confidential Matters are valuable, special, and unique assets of Owner, the disclosure of which could cause substantial injury to and loss of profits and goodwill by Owner. The Confidential Matters to be prepared or compiled by Consultant or Owner or furnished to Consultant during Consultant's service to Owner shall be the sole and exclusive property of Owner.



(b) Upon the termination of Consultant's service with Owner, all Confidential Matters shall be returned to Owner and none of such Confidential Matters or copies thereof shall be retained by Consultant. Consultant shall not at any time, except with the prior written consent of Owner or at its express direction, directly or indirectly, make known, divulge, furnish, or reveal to any person, firm, company, corporation, or anyone else at any time, any of the Confidential Matters or any knowledge or information with respect thereto, or otherwise use such information for any purpose whatsoever. Consultant agrees that it will take all steps reasonably necessary to safeguard all Confidential Matters and to prevent their use, disclosure, or dissemination to any other person or entity. Notwithstanding the foregoing, the aforementioned confidentiality obligation shall not be deemed to apply to any information that becomes generally known to the public through no fault of Consultant's, or which is required by law to be disclosed (in which case Consultant will provide Owner with a reasonable opportunity to seek a protective order maintaining confidentiality).

5. **Termination.** Consultant's services hereunder may be terminated at any time by Owner upon thirty (30) days' prior written notice to Consultant. Consultant's sole compensation in the event of termination shall be the payments due for services performed through the effective date of termination.

6. **Indemnification.** Consultant shall, to the fullest extent permitted by law, defend, indemnify and hold Owner and its managers and members and each of their partners, directors, officers, employees, servants, representatives and agents harmless from and against any and all claims, loss (including reasonable attorneys' fees as well as attorneys' fees incurred in the enforcement of this indemnification), damages, expense and liability (including statutory liability), resulting from injury and/or death of any person or damage to or loss of any property (including economic loss) arising out of any negligent act by Consultant in the performance of the Services. The foregoing indemnity shall include injury or death of any employee of Consultant and shall not be limited in any way by an amount or type of damages, compensation or benefits payable under any applicable Workers Compensation, Disability Benefits or other similar employee benefits acts.

7. **Insurance.** Consultant shall secure, pay for and maintain the following insurance policies in full force and effect during the term of this Agreement:

(a) Commercial General Liability Insurance written on the most current ISO form with limits of $1,000,000 per occurrence Bodily Injury and Property Damage Combined, $1,000,000 per occurrence Personal & Advertising Injury, $1,000,000 aggregate Products and Completed Operations Liability and $2,000,000 General Aggregate. The policy shall be written on an occurrence basis with no deductible.

(b) Professional Liability Insurance in an amount no less than $2,000,000 per claim and in the aggregate annually, with a deductible no greater than $100,000, except if Owner permits a higher deductible. Consultant shall continue to




provide the required coverage for no less than three (3) years after completion of the Services.

In addition, Consultant and Owner shall review and discuss coverages for the following insurance policies within thirty days of the date hereof:

    (i)    Workers' Compensation affording coverage under the Workers' Compensation laws of the State of New York and Employers Liability coverage subject to a limit of no less than $500,000 each employee, $500,000 each accident, and $500,000 policy limit.

    (ii)    Automobile Liability Insurance for Bodily Injury and Property Damage in the amount of $1,000,000 combined and covering all owned, non-owned and hired vehicles. Policy shall be endorsed to name Owner an "additional insured".

The Commercial General Liability and Automobile Liability policies shall be endorsed to name Owner and its directors, officers, and employees as "additional insureds." If requested by Consultant's insurer, Owner will provide the specific identity of the "additional insureds". Coverage for the "additional insured" shall apply on a primary basis irrespective of any other insurance of an "additional insured," whether collectible or not.

    8.    Governing Law. This agreement is made in the State of New York and shall be governed by the internal substantive laws of that State, without reference to conflict of laws provisions. Any disputes arising hereunder shall be adjudicated or arbitrated in the State and County of New York.

    9.    Personal Services. Due to the personal nature of the Services, and to the reliance by Owner on Consultant's experience and expertise to perform the Services in a professional manner, Consultant shall not assign or transfer any of its duties or obligations hereunder, and any attempt to do so shall be null and void and shall constitute a breach by Consultant of its obligations hereunder but may retain subconsultants to assist in the performance of the Services.

    10.    Notices. Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery or delivery by courier to the party to be notified; or five days after deposit with the United States Post Office, by registered or certified mail, postage prepaid and addressed to the party to the notified at the address indicated for such party first set forth above, or at such other address as such party may designate by advance written notice to the other party.

    11.    Amendment; Waiver. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the party having the obligation. No waiver by either party of any default, misrepresentation of breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to

any prior or subsequent default, misrepresentation or breach of warranty or covenants hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

12. **Complete Agreement.** The parties acknowledge that this Agreement constitutes the complete agreement between them and that no oral modification of this Agreement is permissible.

| 45 Park Place Partners, LLC | Ateliers Jean Nouvel |
|---|---|
| SOHO PROPERTIES GP LLC | |
| By: _____ | By: Pascal de Thomasson |
| Name: SHARIF ELGAMAL | Name: _____ |
| Title: _____ | Title: Managing Director |

**Ateliers Jean Nouvel**
10 CITÉ D'ANGOULÊME 75011 PARIS – FRANCE
T+33 1 49 23 83 83 F+33 1 43 14 81 10
WWW.JEANNOUVEL.COM / INFO@JEANNOUVEL.COM
SIRET 398 153 204 300 33  APE 7112B  SAS AU CAPITAL DE 1 500 000 €

Letter of Intent for Design Architect Services
April 28 2014

Between:

**45 Park Place Partners, LLC** having its principal place of business c/o Soho Properties, Inc., 31 West 27th St., New York, New York 10001, United States

Hereinafter known as The Client

And

S.A.S.U. Ateliers Jean Nouvel, a corporation incorporated under the laws of France
having its principal place of business at:
10, Cité d'Angoulême, 75011 Paris, France

Hereinafter known as the Design Architect

The parties agree as follows:

The Client intends to retain the Design Architect to perform certain design services and the Design Architect accepts to perform such services for the Client in accordance with the terms and conditions set forth below.

## INTRODUCTION

The Client intends to develop a mixed-use project on a consolidated site on Park Place in New York City. The project includes a high-end residential tower, below and above-grade amenity space, a public plaza, a rear yard, a museum of Islamic art, and a below-grade sanctuary space.

The Client intends to retain the Design Architect to provide design services for the museum of Islamic art, the public plaza and the sanctuary. The museum will be above ground and will have a GFA of around 5,000 sq. ft. The sanctuary, located partly beneath the museum and partly beneath the adjacent plaza, will have a GFA of around 7,000 sq. ft. The plaza will have a total area of around 3000-4000 sq. ft. A rear yard located behind the tower will have an area of around 2000 sq. ft.

The Client's estimated construction budget for the museum, plaza and sanctuary is around $12,000,000.

The foregoing ensemble is hereafter known as "the Project".

The Client has requested that the Design Architect provide a total design for the Project and provide design oversight during the construction documentation and construction of the Project until final completion.

## 1. SERVICES TO BE PROVIDED BY THE DESIGN ARCHITECT

The Design Architect will assist the Client in developing a detailed program for the Project.



The **Design Architect** will provide a total design for the Project including architecture, interior design, landscaping, and lighting. Specifically the **Design Architect** will be responsible for:

- Architectural design of the building's shell and core
- Architectural design of the plaza
- Interior design of the museum and sanctuary including wall, floor and ceiling materials, finishes, doors and hardware, millwork details, selection and positioning of terminals. The scope of services does not include exhibit or display furniture design.
- Landscape design to schematic level
- Lighting design to schematic level

The **Design Architect** will provide a concept design for the rear yard. The Client will have the option to :

- Commission the **Design Architect** to further develop and construct the rear yard based on the concept;or
- Commission another professional to further develop and construct the rear yard based on the **Design Architect** 's concept or another concept

The **Design Architect** will have primary responsibility during the Concept, Schematic and Design Development phases and will produce most of the documentation during those phases.

The **Design Architect** will have a supervisory role during subsequent phases, providing follow-up on Construction Documents and accompanying the project on site until completion to ensure compliance with design intent.

The **Design Architect** will work with an Architect of Record and specialist consultants appointed by **the Client**, who will produce construction documents and handle relations with local authorities

The **Design Architect** will have design leadership of the project and as such will be authorized to issue instructions to the other members of the design team as required to guarantee the integrity and quality of the design.

The **Design Architect** will endeavour to provide a design that complies with the Client's construction budget. The Client will retain an independent cost estimator to monitor projected construction costs as the project advances.

The **Design Architect** will make Jean Nouvel personally available to design the project and work with **the Client** to ensure that the project meets **the Client**'s requirements.



P7

## 2. ARCHITECT OF RECORD AND SPECIALIST CONSULTANTS

The Architect of Record retained by the Client will:
- Support the **Design Architect** through all phases by providing information regarding local codes and construction practices
- Take responsibility for producing and submitting zoning and building permits
- Take charge of planning, managing and delivering the project during the Construction Documents, Bidding and Construction phases
- Take responsibility for the project as Architect of Record under US law

The **Design Architect** and the Architect of Record will split the design tasks approximately as follows:

|  |  | Design Architect | AoR |
|---|---|---|---|
| Phase 1 | Concept Design | 90% | 10% |
| Phase 2 | Schematic Design | 80% | 20% |
| Phase 3 | Design Development | 80% | 20% |
| Phase 4 | Building Permit Application | 10% | 90% |
| Phase 5 | Construction Documents | 40% | 60% |
| Phase 6 | Bidding | 20% | 80% |
| Phase 7 | Construction and Closeout | 20% | 80% |

In addition to the Architect of Record, The Client will retain such qualified specialist consultants as the **Design Architect** and the **Client** agree are necessary to properly deliver the project. During the Concept, Schematic Design and Design Development phases the specialist consultants will work under the supervision of the **Design Architect**. In subsequent phases the specialist consultants will work under the supervision of the Architect of Record, while the **Design Architect** will review and approve.

## 3. LOCATIONS

The **Design Architect** will produce the work for Phases 1 to 3 in the **Design Architect**'s office Paris and will travel to New York to attend workshops as required.

During Phases 4, 5, 6 the **Design Architect** will collaborate electronically with the Architect of Record and will travel to New York to attend workshops as required.

During Phase 7 the **Design Architect** will assign a salaried AJN project manager to monitor the construction work in New York.


PT

### 4. COMPENSATION

Design Architect services during Concept Design, Schematic Design and Design Development will be invoiced on a lump sum basis as follows and paid by the Client, provided the Work of the Design Architect is progressing in accordance with the agreed schedule (otherwise payments will be made in accordance with the progress of the Work):

| Phase | Months | Per month € | Total € |
|---|---|---|---|
| Concept Design | 2 | 80,000 | 160,000 |
| Schematic Design | 3 | 80,000 | 240,000 |
| Design Development | 3 | 80,000 | 240,000 |
| Total Design Phases | 8 | | 640,000 |

Design Architect services during Construction Documents, Bidding, Construction and Closeout will be invoiced on a monthly basis until completion of the phase. Totals are estimated and will change if the phase durations change.

| Construction Documents | 4 | 40,000 | 160,000 |
|---|---|---|---|
| Bidding, Construction and Closeout | 25 | 8,000 | 200,000 |
| Total Documentation and Construction (estimated) | 29 | | 360,000 |

The Client will pay the Design Architect a mobilization payment in the amount of 80 000 € or $115 000 upon signature of the present Letter of Intent, which shall be applied in full against the first invoice for Concept Design. The Design Architect will commence work on receipt of the mobilization payment. Subsequent payments will be made in accordance with the payment schedule below.

### 5. PAYMENT SCHEDULE

The Client agrees to pay the Design Architect in accordance with the following schedule and subject to the provisions of Section 4:

| Phase | | € | $ |
|---|---|---|---|
| Mobilization payment on signature of the Letter of Intent | May 2014 | 80 000 | 115 000 |
| Concept Design | July 2014 | 80 000 | 115 000 |
| Schematic Design | September 2014 | 80 000 | 115 000 |
| | October 2014 | 80 000 | 115 000 |
| | November 2014 | 80 000 | 115 000 |
| Design Development | December 2014 | 80 000 | 115 000 |
| | January 2015 | 80 000 | 115 000 |
| | February 2015 | 80 000 | 115 000 |
| Construction Documents (estimated at 4 months) | March 2015 | 40 000 | 57 500 |
| | April 2015 | 40 000 | 57 500 |
| | May 2015 | 40 000 | 57 500 |
| | June 2015 | 40 000 | 57 500 |
| Bidding, Construction and Closeout (Payment schedule to agreed at the appropriate time) | | 200 000 | 287 500 |
| TOTAL | | 1 000 000 | 1 437 500 |



PT

Payments to the **Design Architect** will be in Euro or in US Dollars at the Client's discretion. Payments will be made by bank wire only to:

SASU Ateliers Jean Nouvel
IBAN
Code BIC
Domiciliation    BNPPARB PARIS EST ENTREP

### 6. OTHER CONSIDERATIONS

- The fee is calculated on the basis of GFA and construction budget. Should the project GFA or the construction budget vary significantly from the figures stated in the present Letter of Intent the **Design Architect** and the **Client** will agree to an equitable adjustment in the **Design Architect**'s fee.

- Travel and lodging expenses incurred in connection with the project will be paid by the **Client**. The **Design Architect** will obtain the **Client**'s authorization prior to undertaking travel. Jean Nouvel travels in first class; AJN senior staff travel in business class on international flights.

- The fee includes up to three appearances on the part of Jean Nouvel for promotional, fundraising, or programming purposes. Appearances will be timed to correspond to scheduled trips to New York for the project or other projects.

- The fee is net of any applicable US taxes. AJN is a French company without a US affiliate and all the work related to the project will be performed from France. Accordingly the **Client** agrees not to withhold any part of payments to the **Design Architect** for tax purposes.

- Presentation models and videos are not included in the fee.

- The **Design Architect** holds PI coverage with Zürich Insurance Group. If this policy does not provide adequate Commercial General Liability coverage pursuant to the Consulting Agreement by and between the **Design Architect** and the **Client** dated as of the date hereof, the **Design Architect** agrees to pay up to $20,000 USD to obtain adequate coverage.

- Professional presentation models and videos are not included.

- Production of marketing and promotional materials is not included. The **Design Architect** will provide a commercial offer for preparing a marketing book when requested by the **Client**.

- The primary language of the project will be English.

- In case of dispute the governing laws of New York will apply and the New York courts will have jurisdiction.

### 5. COPYRIGHT

The architectural concept will remain the inalienable intellectual property of the Design Architect. Provided that the parties have fulfilled their obligations under the contract, the Design Architect will grant to the **Client** a non-exclusive license to:



- Publish information about the project provided that Jean Nouvel is credited as Design Architect
- Use the image of the project and the name Jean Nouvel for promotional purposes

The license will NOT grant the Client the right to:

- Use the name of Jean Nouvel in association with the project in case of termination of the Design Architect's contract for any reason whatsoever prior to final completion.
- Make modifications to areas of the project visible to the public without soliciting the professional opinion of the Design Architect..

## 6. TAXES

The Design Architect certifies that it is not a United States corporation or any other United States person. The Design Architect will provide a complete and signed Form W-8BEN-E (Certificate of Foreign Status of Beneficial Owner for United States Withholding and Reporting (Entities)) to the Clinet within ten (10) days upon any request by the Client, including a certification that the Design Architect is a resident of France within the meaning of the income tax treaty between the United States and France and meets the requirements of the treaty provision dealing with limitation on benefits.

Unless otherwise specified by the Client, the Design Architect will not perform any services within the United States for or on behalf of the Client. If the Design Architect performs any services within the United States for or on behalf of the Client, the Design Architect shall separately itemize the cost of its compensation for such services performed within the United States and specify whether the Design Architect had a fixed base regularly available to it in the United States for the purpose of performing such services, within the meaning of the income tax treaty between the United States and France.

The Design Architect will bear sole responsibility for payment on its own behalf of any United States income taxes to any United States taxing authority (including state and local taxing authorities). The Design Architect agrees to indemnify and hold the Client harmless in respect of all taxes, interest, and penalties claimed or assessed by any United States taxing authority with respect to the Design Architect, plus reasonable attorneys' fees of the Client.

## 7. COMMENCEMENT OF SERVICES AND BINDING AGREEMENT

The Consulting Agreement and the present Letter of Intent together constitute a binding agreement between the parties. In case of conflict the Consulting Agreement will take precedence.

FOR THE CLIENT
45 PARK PLACE PARTNERS
SOHO PROPERTIES GP LLC

Sharif El-_____ Managing Member

FOR THE DESIGN ARCHITECT
Ateliers Jean Nouvel
10 CITÉ D'ANGOULÊME 75011 PARIS – FRANCE
T +33 1 49 23 83 83  F +33 1 43 14 81 10
WWW.JEANNOUVEL.COM / INFO@JEANNOUVEL.COM

Pascal de Thornasson, Managing Director